UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————

JAMES ALLEN WILFORD,

                    Petitioner,                    Case No. 1:13-cv-808

v.                                                  Hon. Gordon J. Quist

WILLIE SMITH,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner James Allen Wilford is incarcerated with the Michigan Department

of Corrections at the Ionia Correctional Facility in Ionia, Michigan.  On November 23,

2010, following a two-day jury trial, an Ingham County Circuit Court jury convicted him

of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, and felony

firearm, MICH. COMP. LAWS § 750.227b.[1]  On February 9, 2011, the court sentenced

Petitioner as a habitual offender-fourth offense, MICH. COMP. LAWS § 769.12, to 25 to

forty years' imprisonment on the assault conviction, consecutive and subsequent to a

sentence of two years on the felony firearm conviction.

_____

        [1]The November, 2010 trial was Petitioner's second trial on these charges.  His
first trial occurred at the end of August, 2010.  It resulted in a hung jury and,
therefore, a mistrial.  (Trial I, Transcripts I-III, ECF Nos. 15,16,17.)

Petitioner appealed his convictions to the Michigan Court of Appeals.  The court of appeals remanded the matter to the trial court for an evidentiary hearing on Petitioner's ineffective assistance of counsel claims.  The trial court conducted the hearing; heard testimony from trial counsel, Petitioner, and his mother; and then declined to provide any relief.  The court of appeals affirmed the trial court by unpublished opinion dated October 23, 2012.  *People v. Wilford*, No. 303028, 2012 WL 5233612 (Mich. Ct. App. Oct. 23, 2012).  Petitioner applied for leave to appeal to the Michigan Supreme Court.  On April 29, 2013, that court denied leave.  *People v. Wilford*, 829 N.W.2d 224 (Mich. 2013).  Petitioner did not file a petition for certiorari in the United States Supreme Court.

On July 29, 2013, Petitioner filed his initial petition for writ of habeas corpus in this Court, raising five issues:

I.   Defendant was denied the effective assistance of trial counsel in violation of the 6th Amendment.

II.  The prosecutor secured his convictions by the knowing use of [false] and perjured testimony which went uncorrected.

III. Prosecutor's constant insistence on the truth being told by a plea bargained witness served only to amount to inappropriate vouching.

IV.  Judicial bias in violation of the 14th Amendment.

V.   [Abuse of discretion] at the time of [sentencing] in violation of the 14th Amendment.

(Pet., ECF No. 1, PageID.6-9, 14.)  On February 11, 2014, Respondent filed an answer

to the petition,  (ECF No. 8.), along with the state-court record, pursuant to Rule 5,

Rules Governing § 2254 Cases, (ECF Nos. 9-24).[2]

Petitioner then moved to hold this matter in abeyance to permit him to return

to the state courts to exhaust additional constitutional claims.  The Court granted that

relief.  Petitioner filed a motion for relief from judgment in the trial court, as well as a

motion to disqualify the trial judge for bias.  The trial court denied Petitioner's motions

and the Michigan Court of Appeals and Michigan Supreme Court denied leave to

appeal.

Petitioner filed an amended petition on August 31, 2016, raising the following

issues:

I.      Ineffective assistance of trial counsel and appeal counsel in
        violation of [the] 6th and 14th Amendments to the United States
        Constitution.

II.     Trial court punished defendant for exercising his right at the time
        of sentencing. (14th Amendment violation)

III.    Trial court made improper comments which served to illustrate
        judicial bias and to prejudice the court of appeals.

IV.     The prosecutor secured [defendant's] conviction by the knowing
        use of false and perjured testimony.

_____

[2]The Rule 5 materials include several transcripts of the trial court proceedings.  The transcripts shall be
referenced as follows:

| | |
|---|---|
| October 23, 2009 Preliminary Examination Transcript | (Prelim. Exam. Tr., ECF No. 11, p.___) |
| November 22, 2010 Trial Transcript (Vol. 1) | (Trial II, Tr. I,  ECF No. 18, p.___) |
| November 23, 2010 Trial Transcript Amended (Vol. 2) | (Trial II, Tr. II Am., ECF No. 20, p.) |
| February 9, 2011 Sentencing Transcript | (Sentencing Tr., ECF No. 21, p.) |
| June 13, 2012 *Ginther* Hearing Transcript | (*Ginther* Hr'g Tr., ECF No. 22, p.___). |

V.    Did the prosecutor's constant insistence on the "truth" being told by a plea bargained witness serve only to amount to inappropriate vouching.

(Am. Pet., ECF No. 37, PageID.265-270.)  On February 16, 2017, the Respondent filed his answer to the petition (ECF No. 40) as well as additional Rule 5 materials (ECF No. 41).  Respondent contends that Petitioner's habeas claims have no merit, are procedurally defaulted, or are not cognizable on federal habeas review.

Petitioner recently filed another motion to stay these proceedings and hold them in abeyance pending his return to the state courts to exhaust a new claim.  (ECF No. 43.)  Petitioner describes his new claim as follows: "Whether appellate attorney's failure to object to Offense Variables that increased the guidelines minimum sentence range violate his right under the 6th and 14th Amendment[s]."  (Mot. to Stay, ECF No. 43, PageID.576.)  Petitioner cites *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), in support of his new claim.  As set forth fully below, Petitioner has failed to demonstrate his entitlement to the stay and abeyance relief he requests.

With respect to the claims that are properly before the Court, upon review and applying the standards required by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), I find that Petitioner's claims are without merit.  Accordingly, I recommend that Petitioner's motion for stay and the petition be denied.

## Factual background

At about 11:00 a.m. on the morning of October 12, 2009, several Lansing Police Officers responded to a call regarding an armed robbery in progress at 834 Johnson

Street, Lansing, Michigan.  (Trial II, Tr. I, ECF No. 18, p. 128.)  As officers arrived on scene, they set up a perimeter and called into the house, identifying themselves and directing persons present in the house to exit.  (*Id.*, pp. 129-131.)  One man came out almost immediately, Dennis Martin, carrying his 7 month-old son.  (*Id.*, pp. 132-133, 210.)  Shortly thereafter, three men, Michael Davis, Ricardo Payton, and Petitioner, exited in rapid succession with their hands up.  (*Id.*, pp. 133-134, 183-185, 197-198, 210-212.)  Officers directed the men to remain on the porch until instructed otherwise.  (*Id.*)  Officers then directed the men off the porch one by one; each was secured in a police vehicle.  (*Id.*)  Police then cleared and searched the home.  (*Id.*, p. 120-123, 185, 187, 201-203, 212-215.)  They found a revolver in the kitchen sink.  (*Id.*, p. 120, 202.)

Three of the men who walked out of the house that day testified at Petitioner's trial.  Their stories were irreconcilable.

### Dennis Martin (Trial II, Tr. I, ECF No. 18, p. 137-180)

The first man out of the house was Dennis Martin.  Mr. Martin testified that he and his son were sleeping in an upstairs bedroom around 11:00 a.m. on October 12, 2009.  (*Id.*, p. 138.)  Mr. Martin woke when he heard a loud noise.  He left the bedroom and went to the first landing on the stairs.  He saw his front door fly open and three men entered his home.  Each was wearing something across his face.  Mr. Martin headed back up the stairs, but Petitioner pointed a gun at him and directed him to come down the stairs.

Mr. Martin testified that the three men directed him to lay down on the living room floor and face the wall.  Mr. Martin handed over the cash in his pockets, a little

over $400 including a two-dollar bill.  One of the intruders hit Mr. Martin in the face.

Petitioner and Michael Davis retrieved Mr. Martin's son from the upstairs bedroom

and, from that point forward, Mr. Martin held his son.  Two of the three men searched

the home: the upper floor, the main floor, and the basement.

The men repeatedly asked for "the stuff," which Mr. Martin took to mean drugs.

He testified that there were no drugs in the house and that he never kept drugs in the

house.  Petitioner took Mr. Martin and his son down into the basement.  Petitioner left

them there while the search for "the stuff" continued.  Mr. Martin called the police on

his cell phone while he and his son were alone in the basement.  He then hid the phone

and waited for the police to arrive.

When it was apparent the police had arrived, Petitioner came into the basement

again and tried to talk Mr. Martin into blaming the other two intruders and saying that

Petitioner had simply been at the home visiting when the robbery occurred.  Mr. Martin

walked up the stairs with his son and walked out the front door.  Mr. Martin testified

that he did not know Michael Davis or Ricardo Payton, but that he was familiar with

Petitioner because they had attended middle school together.

### Michael Davis (Trial II, Tr. I, ECF No. 18, p. 225-270)

Michael Davis provided a different account of the robbery.  Mr. Davis testified

that he and Petitioner were friends.  They had planned the robbery and met at Mr.

Davis' house that morning.  Mr. Davis claimed that Petitioner picked him up in a black

Suburban.  They picked up Ricardo Payton, Mr. Davis's friend, on the way.  Mr. Davis

had purchased marijuana from Mr. Martin previously.  Mr. Payton had done so as well.

- 6 -

They called Mr. Martin to set up the purchase of five pounds of marijuana, but instead of paying for it, they planned to simply steal it.  Mr. Davis claims he was not aware that Petitioner had brought a gun.

They parked the Suburban at a store near Mr. Martin's home and walked to the house.  Mr. Davis claims they knocked on the door and Mr. Martin let them in.  Mr. Davis said they were not wearing masks or anything to cover their faces.  Once inside, Mr. Martin ran upstairs to grab the baby.  When he came downstairs, they all moved to the dining room and started talking about the marijuana.  Mr. Martin pulled out a bag of marijuana, but it was just a small amount, not the quantity they had requested. At that point, Petitioner, Davis and Payton began to press Mr. Martin for the larger amount of marijuana.  Petitioner pulled out the gun.

While Petitioner held Mr. Martin at gunpoint, Davis and Payton began to search the home.  They found more marijuana and some pills hidden behind the television.  Mr. Davis pocketed the drugs, but it was still far short of the quantity they expected.  Mr. Martin handed the money in his possession over to Mr. Davis.  As Payton and Davis continued to search upstairs in the bedrooms, Petitioner took Mr. Martin and his baby down to the basement.

When Payton and Davis caught up to Petitioner in the basement, they learned that Mr. Martin had called the police.  Davis heard Petitioner attempt to convince Mr. Martin to blame the robbery on Davis and Payton, but not Petitioner.  Petitioner offered Martin cash to tell that story.  Mr. Davis hid the bag of drugs in the basement rafters.

The four men headed back upstairs.  Payton looked out the window and saw the police.  The men then walked out, Martin first.

### Petitioner (Trial II, Tr. II, ECF No. 19, p. 6-25)

Petitioner's testimony regarding the events of October 12, 2009, did not square with Martin's version or Davis' version.  Petitioner claimed that he did not even know Davis or Payton, but that Mr. Martin was Petitioner's friend.  Petitioner claimed that his friend Teasa Flantoill drove Petitioner over to Martin's house in her Dodge Neon at about 10:30 a.m.  He planned to purchase some Vicodin from Martin and just hang out with him.

After Teasa dropped Petitioner off, he went to the front door and was knocking on the door when two individuals (Davis and Payton) ran onto the porch from the side of the house, pulled a gun, and directed Petitioner to open the front door.  Petitioner was unable to open the door, so Payton kicked the door in.

Mr. Martin was on the stairs when the three men entered the house.  Davis followed him up.  Payton pushed Petitioner up the stairs as well.  Petitioner claims he came upon Davis in one of the bedrooms, questioning Martin about the drugs.  Davis hit Martin with the gun.  Martin handed over the money and then took the group downstairs where he showed Davis the drugs hidden behind the television.

Davis told Martin he was not leaving until Martin gave up all the drugs.  The conversation suggested that Davis had been part of a robbery at Martin's home a few days before as well.  Martin told Davis to search the house himself if he did not believe Martin's claim that he had already given up all of the drugs.  Davis moved Martin and

- 8 -

Petitioner into the kitchen on the way down the stairs to the basement.  Convinced he would be shot there, Petitioner's legs locked up and he fell to the floor in the kitchen.

Davis then went up and down the basement stairs three times, the last time, after it was apparent the police had arrived, he took the bag of drugs down with him. Davis came back up with Martin and the baby.  Petitioner claims that at that point, Martin snapped.  Martin began accusing Petitioner of leading Davis and Payton there, casting Petitioner as one of the robbers instead of a victim.  Then they walked out of the house to meet the waiting police.

### Ms. Flantoill (Trial II, Tr. II, ECF No. 19, p. 26-34)

After Petitioner testified, the prosecutor called Ms. Flantoill in rebuttal.  She testified that Petitioner maintained a music studio at his house, something Davis had claimed and Petitioner had denied.  She testified that Petitioner drove his mother's black Suburban, something Davis had claimed and Petitioner had denied.  She testified that Petitioner had a cell phone, something Davis had claimed and Petitioner had denied.  After looking at pictures of Davis and Payton, she noted that she had seen Davis at Petitioner's home recording in the music studio, something Davis had claimed and Petitioner had denied.  Ms. Flantoill then testified that she owned a Dodge Neon, but she had never given Petitioner a ride anywhere and certainly had not given him a ride on October 12, 2009, to Martin's house.  She testified that she was at work that morning and had never been to the house on Johnson Street.

The jury deliberated for about an hour before reaching its verdict.

### Discussion

- 9 -

I.    <u>Motion for stay</u>

Petitioner has filed a motion to stay these proceedings and hold them in abeyance so that he might return to the state courts to exhaust a new claim, a claim that Petitioner asserts he discovered only recently.  (Pet.'s Br., ECF No. 44, PageID.579.) The "stay and abeyance" relief requested by Petitioner was authorized by the Supreme Court in *Rhines v. Weber*, 544 U.S. 269 (2005), but "only in limited circumstances." *Id.*, at 277.[3]  Under *Rhines*, a district court may, in its discretion, stay the mixed petition pending prompt exhaustion of state remedies if there is "good cause" for the petitioner's failure to exhaust, if the petitioner's unexhausted claims are not "plainly meritless" and if there is no indication that the petitioner engaged in "intentionally dilatory litigation tactics." *Rhines*. at 278.

Petitioner proposes a return to the state courts based on a newly discovered claim related to the scoring of offense variables used to calculate Petitioner's minimum sentence.  Petitioner's offense variables were scored at 20 points.  *Wilford*, 2012 WL 5233612 at *3.  If he succeeded in altering that score downward by even a point, it would shift his guidelines minimum from a range of 126-420 months, *Id.*, to a range of 108-360 months, MICH. COMP. LAWS §§ 777.62, 777.21(3)(c).  Of course, the term of

---

[3]It is worthy of note that Petitioner's situation is not the situation for which the *Rhines* Court created the stay and abeyance remedy.  The *Rhines* Court created that remedy for petitioners who filed petitions containing exhausted <u>and</u> unexhausted claims, known as mixed petitions.  Petitioner's petition includes only exhausted claims.  The claim he now wishes to raise in the state court is a new claim that is not presently part of his petition.  Another district court in this circuit has concluded that *Rhines* should be applied even where the unexhausted claim is not presently part of the petition.  *See Phillips v. Warden, Nobles Corr. Inst.*, No. 2:16-cv-00763, 2017 WL 1419985 (S.D. Ohio Apr. 21, 2017). I will proceed accordingly.

Petitioner's minimum sentence, as imposed, would still fall within that guidelines range.

Such guidelines scoring issues, however, are purely matters of state law and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000); *Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987). Accordingly, to the extent Petitioner's claim is only about improper scoring, it is plainly meritless and does not warrant a stay.

Petitioner's citation to *Lockridge*, 870 N.W.2d at 502, however, indicates that he intends to raise something more than just an "improper scoring" claim. By citing *Lockridge*, Petitioner attempts to challenge his guidelines scoring on Sixth Amendment grounds.

In raising *Lockridge*, Petitioner essentially argues that the trial court judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt. Such an argument derives from the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system at issue in *Blakely*, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). The Sixth Circuit has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th

- 12 -

Cir. 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).

Subsequently, in *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151 (2013), the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences. Shortly thereafter, the Michigan Court of Appeals concluded that *Alleyne* only prohibited judicial factfinding used to determine a mandatory minimum sentence, but had no impact on judicial factfinding in scoring the sentencing guidelines producing a minimum range for an indeterminate sentence, the maximum of which is set by law. *See People v. Herron*, 845 N.W.2d 533, 539 (Mich. App. 2013). The Sixth Circuit also concluded that *Alleyne* did not decide the question whether judicial factfinding under Michigan's indeterminate sentencing scheme violated the Sixth Amendment. *See Kittka v. Franks*, 539 F. App'x 668, 673 (6th Cir. 2013). As a consequence, the Sixth Circuit held, the question is not a matter of clearly established Supreme Court precedent. *Id.* (citing *Montes v. Trombley*, 599 F.3d 490, 498 (6th Cir. 2010)); *see also Saccoccia v. Farley*, 573 F. App'x 483, 485 (6th Cir. 2014) ("But *Alleyne* held only that 'facts that increase a mandatory *statutory* minimum [are] part of the substantive offense.'. . . It said nothing about guidelines sentencing factors . . . .") (quoting *Alleyne*, 133 S. Ct. at 2161 (emphasis added)).

In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), in a 5-2 decision, the Michigan Supreme Court held to the contrary. The court reasoned that, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found

by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range," they increase the "mandatory minimum" sentence under Alleyne. *Lockridge*, 870 N.W.2d at 506 (emphasis in original). As a consequence, the *Lockridge* court held that the mandatory application of Michigan's sentencing guidelines was unconstitutional, and the remedy was to make them advisory only. *Id.* at 520-21.

*Lockridge*, by its own terms, is inapplicable to Petitioner's sentence, however. The Michigan Supreme Court only made its holding in *Lockridge* applicable to cases still "pending on direct review." *Id.* at 523. Petitioner's case was not pending on direct review at the time the *Lockridge* court reached its decision.

Moreover, the Michigan Supreme Court's decision in *Lockridge* does not render the result "clearly established" for purposes of habeas review. This Court may consider only the "clearly established" holdings of the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. For the same reasons, it may not consider the holdings of the state courts. Instead, this Court may only grant relief on habeas review if the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there

could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington*, 562 U.S. at 103).

As is apparent from the reasoned decisions of the Michigan Court of Appeals in *Herron*, 845 N.W.2d at 539, and the Sixth Circuit in *Kittka*, 539 F. App'x at 673, and *Saccoccia*, 573 F. App'x at 485, as well as the decision of the dissenting justices in *Lockridge* itself, reasonable jurists could and did disagree about whether *Alleyne* applied to the calculation of Michigan's minimum sentencing guidelines. *Alleyne* therefore did not clearly establish the unconstitutionality of the Michigan sentencing scheme.

In this instance, however, Petitioner's proposed *Lockridge* challenge is indirect. He does not claim that his sentence is unconstitutional under *Lockridge*. Instead, he claims that his appellate counsel rendered ineffective assistance because he failed to challenge Petitioner's sentence using the reasoning of *Lockridge*, or perhaps *Alleyne*. The standard for deciding such a claim is set forth in detail in § V, below. A more concise analysis is all that is required to dispose of Petitioner's contention.

The clearly established federal law regarding such a claim is set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The first step in the *Strickland* analysis requires Petitioner to show that counsel's performance fell below an objective standard of reasonableness. *Id.* Petitioner cannot show that his appellate counsel was ineffective for failing to present the reasoning of *Lockridge* or *Alleyne* because neither case had been decided at the time of Petitioner's appeal. The standard at that time was founded on *Blakely*. Applying *Blakely*, the Sixth Circuit in *Chontos*, 585 F.3d at 1000,

- 15 -

and the Michigan Supreme Court in *Drohan*, 715 N.W.2d at 778, clearly held that Michigan's indeterminate sentencing scheme did not raise any Sixth Amendment issues.  It was certainly not unreasonable for counsel to fail to raise an issue clearly rejected by Michigan Supreme Court precedent.

Because the new claim Petitioner seeks to exhaust would not entitle him to habeas relief, he is not entitled to a stay during the pendency of his efforts to exhaust the claim in state court. *Rhines*, 544 U.S. at 277 (holding that granting stay and abeyance requires the presentation of a non-frivolous claim).

II.    <u>AEDPA standard</u>

This action is governed by the AEDPA.  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult

to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3

- 17 -

(quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Here, Petitioner claims virtually every participant in his criminal prosecution–the prosecutor, the trial judge, his trial counsel, and his appellate counsel–failed him.  His claims against each participant are considered below.

III.    The prosecutor (habeas issues IV and V)

Petitioner contends that the prosecutor secured Petitioner's convictions by the knowing use of perjured testimony from Michael Davis and by impermissibly vouching for Michael Davis's credibility.

A.    Perjured testimony

Petitioner states that Michael Davis's "first trial testimony was changed in the second trial (not all of it)."  (Am. Pet., ECF No. 37, PageID.269.)  He further notes that

"[i]t was never brought to the jury['s] attention that Davis['s] initial story changed from the crime scene after he sat in the courtroom and heard [the] victim testify (during prelim[inary examination])." (*Id*.)  He elaborates on his position in his pro-se supplemental brief filed as part of his initial appeal to the Michigan Court of Appeals. (Std. 4 Br., ECF No. 23, p. 26-32.)   In that brief, Petitioner tracks several inconsistencies in Mr. Davis's version of events, as stated upon his arrest, then in a recorded police interview, then his testimony at the first trial, and finally his testimony at the second trial.  My review of the record reveals that Mr. Davis's version of the events in question is generally consistent, with some changes in the details over time.

The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

> The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted); *see also Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).   Petitioner bears the burden of demonstrating that the testimony was actually perjured. *Lochmondy*, 890 F.2d at 822.

- 19 -

The state appellate court's resolution of the matter must be evaluated in light of that clearly established federal law.

The Michigan Court of Appeals rejected Petitioner's argument:

> [T]he record does not support defendant's contention that he was denied due process as a result of the prosecutor's introduction of perjured testimony.  There is no indication in the record that the testimony was false, that the prosecution knowingly offered perjured testimony, or that it failed to disclose information to the court and defense counsel.  Any inconsistencies in evidence between defendant's first and second trial were available in the trial transcripts and police reports and were not withheld from the court and defense counsel.

*Wilford*, 2012 WL 5233612 at *3.  As noted by the state appellate court, Petitioner's argument fails in its very premise.  He fails to establish that the testimony Davis offered at Petitioner's second trial was false.  Simply pointing out inconsistencies between statements does not suffice to demonstrate which statement is false.  *Lochmondy*, 890 F.2d at 822.  Moreover, Petitioner offers nothing to indicate that the prosecutor knew which of the inconsistent versions was the true one.  The materiality of the inconsistent testimony is also questionable.  The inconsistencies related to facts peripheral to the robbery itself, i.e., when was the robbery planned, why were Petitioner and Davis together that morning, who initiated Payton's involvement in the robbery, had Petitioner ever purchased marijuana from Martin, and whether Davis knew who put the gun in the sink.  Finally, the inconsistencies between Davis' prior statements and his testimony at the second trial were made known to the jury by the prosecutor and Petitioner's counsel.  (Trial Tr. I, ECF No. 18, p. 232-233, 255-257, 266-269.)

The Michigan Court of Appeals determination of this issue is neither inconsistent with nor is it contrary to clearly established federal law.  The factual determinations upon which the decision is based are reasonable on the record.  Petitioner is not entitled to habeas relief on this claim.

B.    Vouching

The prosecutor began his questioning of Michael Davis with a series of questions relating to the terms of Mr. Davis's plea agreement, including the following exchange:

> Q:    Now, as a condition of your plea agreement, your testimony in this case must be complete and truthful, is that correct?
>
> A:    Yes.
>
> Q:    It doesn't matter whether you implicate the Defendant or not; you just have to be complete and truthful, is that right?
>
> A:    Yes.
>
> Q:    And if you don't, if you are not complete and truthful, your agreement goes away, is that right?
>
> A:    Yes.

(Trial Tr. I, ECF No. 18, p. 227.)  Petitioner argues that the repeated references to "complete and truthful" constitute impermissible vouching.

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see  Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).  The first type impermissibly

- 21 -

places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965);  *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955). Neither type of vouching is involved in this case.[4]

The Sixth Circuit has explored whether and when a prosecutor's reference to the requirement to testify truthfully in a plea agreement might rise to the level of vouching. Simply inquiring as to the existence of a term in the plea agreement regarding truthful testimony does not violate due process.  *See United States v. Reid*, 625 F.3d 977, 984 (6th Cir.2010) (concluding that "[b]ecause the prosecutor limited his questions and comments to th[e] facts [of the plea agreements] and did not imply any special knowledge regarding the credibility or truthfulness of the cooperating witnesses, the prosecutor did not improperly vouch for the witnesses."); *United States v. Presley*, 349 Fed. Appx. 22, 26–27 (6th Cir.2009) (finding no improper vouching where the prosecutor

_____

[4]Notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct. Given the Supreme Court's recent admonitions regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation.  *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White*, 134 S. Ct. at 1703 (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 132 S. Ct. at 2155 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

"simply mentioned the existence of the plea agreements" with the witness but "did not imply that these agreements ensured that they were being truthful."); *United States v. Trujillo*, 376 F.3d 593, 608–09 (6th Cir.2004) ("[T]he prosecutor did not offer any personal observations or opinions as to the veracity of [the witnesses], nor did she place the prestige of the Government behind their credibility.  Rather, the prosecutor's questions and comments merely encompassed the terms of [the witnesses'] plea agreements . . . ."); *United States v. Tocco*, 200 F.3d 401, 416–17 (6th Cir.2000) (introduction of plea agreement which contained requirement of truthful testimony, standing alone, was not improper); *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) ("We have allowed a prosecutor to refer to the plea agreement of a testifying witness. . . .  The prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.')(citation omitted).

It is certainly possible to stray beyond the permissible boundary of simply referencing the terms of the plea agreement.  In *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994) the court identified such a trespass:

> [T]he prosecutor blatantly implied that the Patrick's plea agreements ensured that the witnesses were truthful; the prosecutor did not give the jury any inkling that the government has no independent means of discerning truthfulness.  Further, the prosecutor placed the prestige of the government, and even of the court, behind the credibility of the Patricks, by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy.  This implied to the jury that the government and the court

- 23 -

> were satisfied that the witnesses were truthful.  This constitutes
> improper vouching.

*Id.* at 1389.  Petitioner's prosecutor did not make any such statements.  To the contrary,

the prosecutor noted:

> You can't resolve all these inconsistencies.  We are not asking you to say
> Dennis Martin is telling the truth.  We are not asking you to say that
> Michael Davis is telling you the truth.  We are not asking you to say that
> anybody is telling the truth beginning to end, even the officers.  We are
> asking you to decide the elements of the crime, of the two crimes. . . .
> Nobody should be put on a pedestal in this case, not Dennis Martin, not
> Michael Davis, nobody.

(Trial II, Tr. II, ECF No. 19, p. 61.)

The analysis of the Michigan Court of Appeals, in rejecting Petitioner's vouching

claim, tracked the federal law described above:

> [T]he prosecutor did not impermissibly vouch for the credibility of an
> accomplice when he elicited testimony that the witness was testifying
> truthfully as a condition of his plea agreement.  Introduction of an
> accomplice's promise to testify truthfully is not necessarily error unless
> "used by the prosecutor to suggest that the government has some special
> knowledge that the witness is testifying truthfully." *People v. Rodriguez*,
> 251 Mich App 10, 33; 650 NW2d 96 (2002).  Here, the prosecutor briefly
> questioned the witness about the plea agreement and did not suggest any
> special knowledge for truthfulness.  Rather, the testimony suggested that
> the witness testified pursuant to a plea agreement, which is allowed.
> *People v. Dowdy*, 211 Mich App 562, 572; 536 NW2d 794 (1995).  Further,
> after defense counsel questioned the credibility of the witness during
> closing arguments, the prosecutor stated in rebuttal that, "We are not
> asking you to see that [the witness] is telling you the truth. We are not
> asking you to say that anybody is telling the truth beginning to end, even
> the officers."

*Wilford*, 2012 WL 5233612 at *3.  Petitioner has failed to demonstrate that the state

court's determination of his vouching claim is inconsistent with or contrary to clearly

established federal law.  Moreover, Petitioner has failed to demonstrate that the state

- 24 -

court's factual determinations supporting its conclusions are unreasonable on the record before it.  Accordingly, Petitioner is not entitled to habeas relief on his vouching claim.

IV.    The trial judge (habeas issues II and III)

The trial judge's statements at Petitioner's sentence hearing, he argues, revealed that the trial judge was biased against him and used the sentence to punish Petitioner for exercising his right of allocution.  Neither claim merits habeas relief.

A.    Bias

There can be little question that the trial judge's statements at Petitioner's sentencing reflect the judge's exasperation with Petitioner.  At the sentencing, the trial judge invited Petitioner to offer comment with regard to his sentence.  (Sentencing Tr., ECF No. 21, p. 5.)  Petitioner proceeded to offer a five point argument about trial counsel's ineffective assistance.  (*Id*., p. 5-9.)  The trial judge responded as follows:

> THE COURT:        Shut up. Mr. Wilford.  What does this have to do with what kind of sentence I am going to pass here today.  I mean, what exactly do you think you are doing this time?  You have gone through lawyer after lawyer.  You have manipulated the system in any way you can.  The things you say are not true.  You have made up things whole cloth.
>
> Mr. Marks tried this case.  He did an effective, fair job for you on both trials.  I [sat] through that trial, [sat] through both of them.  You never made one complaint.  And if anybody I've ever seen in a courtroom make complaints, it's you.  You are now trying to manipulate the system in order to create some issues for yourself.
>
> The real point, Mr. Wilford, is that you were convicted of very serious charges.  My own opinion of your testimony was exactly the same as that of the jury.  It was unbelievable.
>
> THE DEFENDANT        Well due to Mr. Marks' incompetence–

THE COURT       You just go right on–don't–you go right on Mr. Wilford.  Say what else you want to say because I want it on the record that you are making all this up and it's false.

THE DEFENDANT       Due to Mr. Marks' incompetence, Mr. Crino special favors to Michael Davis and Payton for testifying on the murder case, and Mr. Roth putting so-called victim Martin on the stand, whom I knew was shading his testimony by lying, that's caused a miscarriage of justice on me and on my family.

THE COURT       I never seen anybody more guilty after a trial than you were, sir.  I hate to even have to sit here and say this, but you have attempted to manipulate this system from the day you were charged.  From the day you were charged you have manipulated the system.  You had good lawyers representing you in the past.  Those lawyers had to withdraw because of the manner in which you handled this.

                                    *       *       *

THE DEFENDANT       [I]s that why you are mad at me?

THE COURT       Mr. Wilford, I am not mad at anybody.  I don't have any friends, and certainly not you or Mr. Marks or Mr. Toman.

THE DEFENDANT       That's what you said.

THE COURT       All right.  Excuse me.  You make it up as you go.

THE DEFENDANT       Well, its on the record.

THE COURT       I am sorry, sir.  What else do you want to say about what kind of sentence you ought to get?

THE DEFENDANT       I am innocent.  I mean--

THE COURT       No, you are not.

THE DEFENDANT       You do whatever you feel.

THE COURT       You are just plain guilty, sir.  You are as guilty as anybody we ever had.  And I don't normally say anything, but I got to tell you, I want the court of appeals–because you'll file an appeal.  I want the court of appeals to know how manipulative you are.  You will manipulate.

This gentleman spent a lot of time representing you, and you come in here and throw him under the bus. You will throw anybody under the bus. It don't matter who it is. That's the way you are, Mr. Wilford. That's your personality.

THE DEFENDANT        I feel this Court is just throwing me under the bus.

THE COURT        I am going to sentence you. I am not throwing you under anything.

(*Id.*, p. 9-12.)[5]

"Due process requires a fair trial before a judge without actual bias against the defendant or an interest in the outcome of his particular case." *United States v. Armstrong*, 517 U.S. 456, 468 (1996); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness requires an absence of *actual* bias in the trial of cases.") (emphasis added)). However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge's] position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (internal quotations omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009). The Supreme Court has recognized constitutionally impermissible, objective indicia of bias

---

[5]The judge's statement about not having any friends was not a comment about his social status, but a response to Petitioner's accusation that Petitioner's prior attorney, Mr. Toman, was a friend of the judge. Petitioner's suggestion that the record would demonstrate that the judge had previously claimed a friendship with Mr. Toman was incorrect. At the hearing on Mr. Toman's motion to withdraw, Petitioner claimed he had smelled alcohol on his counsel's breath. The judge responded by saying: "I have known Mr. Toman for 20 years and never seen him even drink, do you know that? Never even seen him near alcohol." (Motion to Withdraw Tr., ECF No. 13, p. 3.) The judge never stated that he and Mr. Toman were "friends."

in the following types of cases:  (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1997) (subsequently expanded to include even indirect pecuniary interest, *see Railey v. Webb*, 540 F.3d 393, 399-400 (6th Cir. 2008); (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 136 S. Ct. at 1905 (citing *Withrow v. Larkin*, 421 U.S. 35, 53 (1975).

Petitioner does not allege any of the objective indicia of constitutionally impermissible bias.  Instead, he relies upon the judge's words at sentencing as an example of bias that Petitioner claims affected the entire trial.  In *Liteky v. United States*, 510 U.S. 540 (1994),[6] the Supreme Court described the showing Petitioner would have to make to succeed on his bias claim:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  *See United States v. Grinnell Corp.*, 384 U.S., at 583, 86 S.Ct., at 1710.  In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.  Almost invariably, they are proper grounds for appeal, not for recusal.  Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they

---

[6]*Liteky* is a case that addresses the statutory recusal standard for federal judges.  The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause. *See, e.g., Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 LED. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555-556.

The Michigan Court of Appeals gave Petitioner's bias argument short shrift: "defendant's unpreserved argument that the trial court denied defendant a fair trial by breaching the veil of impartiality at sentencing in an attempt to bias the Court of Appeals against defendant is similarly without record support." *Wilford*, 2012 WL 5233612 at *3. But, the fact that the analysis is curt does not make it unreasonable. The record amply supports the conclusion that the judge's statements at sentencing were "expressions of impatience, dissatisfaction, annoyance, and even anger[,]" *Liteky*, 510 U.S. at 555-556, flowing from Petitioner's claims at sentencing that his counsel rendered ineffective assistance at trial.

- 29 -

It was undisputed that Petitioner was at the scene of the robbery when it took place.   Petitioner's claim that he was a victim rather than a perpetrator was unsupported by any of the other participants.  For his story to have any credibility, he needed someone to corroborate his version of the events.  At the first trial, Petitioner offered the name of someone who could corroborate his story: Teasa, Petitioner's friend who drove a Dodge Neon.  (Trial I, Tr. II, ECF No. 16, p.107-108, 116.)  At the second trial, Petitioner was even more specific.  He testified that the friend who drove him to Mr. Martin's house in her Dodge Neon was Teasa Flantoill.  (Trial II, Tr. II, ECF No. 19, p. 7, 18.) Ms. Flantoill's testimony, however, was particularly damning because she contradicted several key points from Petitioner's testimony.

Thus, Petitioner's testimony was not only uncorroborated by any other witness, it was contradicted by every other witness, including the most disinterested witness, Ms. Flantoill.  Yet, at sentencing, Petitioner blamed his counsel's ineffective assistance for the result.  The judge's frustration with Petitioner was understandable.  The Michigan Court of Appeals' conclusion that the sentencing exchange was nothing more than an expression of that frustration, and that there was no evidence of the deep-seated antagonism necessary to show impermissible bias, is not unreasonable.  The state court's ultimate determination that Petitioner had failed to show impermissible bias is neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief.

   B. <u>Punishing Petitioner for his allocution</u>

Petitioner next complains that his exchange with the trial judge at sentencing, quoted above, indicates that the trial judge punished him for exercising his right of allocution.  The Michigan Court of Appeals rejected this argument as concisely as it rejected Petitioner's judicial bias claim.  The court stated: "the record does not support defendant's unpreserved argument that the trial court punished defendant for exercising his right at sentencing to challenge his prior convictions of assault with intent to rob while armed and felony firearm at the time of allocution." *Wilford*, 2012 WL 5233612 at *3.  The court's brevity renders the result somewhat cryptic; but, no matter how one interprets the state appellate court's decision, Petitioner has failed to show it is contrary to or an unreasonable application of clearly established federal law or that the court's factual determinations are unreasonable on the record.

It is likely that the court of appeals' conclusion that Petitioner's argument was unsupported by the record is based on the determination that, as a matter of fact, Petitioner was afforded full allocution.  The trial court invited Petitioner to speak, stating:  "Go right ahead, Mr. Wilford, this is your chance to make your statement, sir." (Sentencing Tr., ECF No. 21, p. 5.)  Petitioner stated he intended to raise five points; and then he raised five points, without interruption.  (*Id.*, p. 5-9.)  The trial court interrupted Petitioner at the end of his fifth point.  The exchange quoted at length above followed.  Then, the court invited Petitioner to speak specifically with regard to the sentence.  (*Id.*, p. 11.)  Petitioner ultimately told the court to "do whatever you feel." (*Id.*)  There is no indication in the record that Petitioner had anything more to say.

Petitioner acknowledges that his right to allocate is derived from the Michigan Court Rules, which state: "At sentencing, the court must, on the record: . . . give the defendant . . . an opportunity to advise the court of any circumstances they believe the court should consider in imposing sentence . . . ." MICH. CT. R.  6.425(E)(1)(c).[7]  To the extent the Michigan Court of Appeals concluded that the opportunity afforded Petitioner was sufficient under the court rule, that conclusion is binding upon this Court.  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 68.  The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

The state court rule defines the absolute boundary of Petitioner's right to allocution.  There is no constitutional right to allocution under the United States Constitution. *Pasquarille v. United States*, 130 F.3d 1220, 1223 (6th Cir.1997) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)); *United States v. Vujovic*, 635 F. App'x 265, 272 (6th Cir. 2015); *Cooey v. Coyle*, 289 F.3d 882, 912 (6th Cir. 2002).  Therefore, a trial court's failure to afford a defendant the right to allocution is not a claim

---

[7]Petitioner cites MICH. CT. R. 6.425(D)(2)(c) as the source of that right.  The rule was amended in 2005, and it now appears at MICH. CT. R. 6.425(E)(1)(c).

cognizable on habeas review.  *Scrivner v. Tansy*, 68 F.3d 1234, 1240 (10th Cir.1995); *Harrelson v. Trippett*, No. 95-1199, 1995 WL 579571, *9, n. 5 (6th Cir. Oct. 2, 1995).

Finally, the Michigan Court of Appeals might have concluded that Petitioner's argument is unsupported on the record because there is no evidence that Petitioner was "punished" for exercising his right to allocute.  Although the trial judge had obviously lost patience with Petitioner because he was "always try[ing] to build something to make an excuse for [him]self" (Sentencing Tr., ECF No. 21, p. 5), the judge still sentenced Petitioner within the guidelines to a minimum sentence well short of the maximum minimum urged by the prosecutor.[8]  Other than the judge's exasperation, there is no evidence in the record of any consequence of Petitioner's allocution.  Thus, on the record before the Court, Petitioner has failed to demonstrate his entitlement to habeas relief.

V.    Petitioner's counsel (habeas issue I)

Petitioner alleges his appellate counsel rendered constitutionally ineffective assistance because he failed to:

  (A)    disqualify the trial judge for his bias; and

  (B)    raise ineffective assistance of trial counsel claims with respect to trial counsel's failure to

   (1)    prepare and investigate testimony from Ms. Flantoill and Petitioner's mother;
   (2)    meet with Petitioner between the trials;

---

[8]The Michigan Court of Appeals noted that Petitioner's guideline minimum sentencing range was 126 to 420 months.  *Wilford*, 2012 WL 5233612 at *3.  The sentence of 300 months fell near the middle of that range.

- 33 -

(3)     inform and advise Petitioner with respect to the plea offer
        of a ten-year minimum;

(4)     advise Petitioner of the relative strengths and weaknesses
        of his case; and

(5)     advise Petitioner of the possible sentence exposure.

(Pet.'s Br. in Supp. of Mot. for Relief from J., ECF No. 41-2, PageID.345.)[9]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent

---

[9]Petitioner provides a list of instances of ineffective assistance of counsel in his amended petition. (Am. Pet., ECF No. 37, PageID.265.) Petitioner's most complete statement of counsel's ineffective assistance, however, appears in the brief he filed in support of his motion for relief from judgment. Accordingly, I have considered the ineffective assistance of counsel claims Petitioner raised in his amended petition as illuminated by his state court brief.

- 34 -

assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

Both the court of appeals on Petitioner's direct appeal and the trial court on Petitioner's motion for relief from judgment resolved Petitioner's ineffective assistance claim using the *Strickland* standard.  *See Wilford*, 2012 WL 5233612 at *1;[10] (Dec. 23, 2014 Op., ECF No. 41-3, PageID.403.)  Thus, it cannot be said that the state courts applied the wrong standard.  Nor did it apply the standard wrongly.

---

[10]The Michigan Court of Appeals cited state authority for the standard, *People v.. Jordan*, 739 N.W.2d 706, 712 (Mich. Ct. App. 2007), but that state authority ultimately has its foundation in *Strickland*.

- 35 -

A.    <u>Disqualification</u>

The trial judge concluded that Petitioner's "failure to disqualify" argument failed

at the first step:

> Defendant first alleges he was denied effective assistance of appellate counsel for failing to disqualify the trial judge on remand at the evidentiary hearing regarding the effective assistance of trial counsel. However, a review of the transcript from the evidentiary hearing on June 13, 2012, shows on pages 3-5 that appellate counsel did motion for the trial judge to disqualify himself.  The trial judge denied the motion.
>
> Defendant also argues that appellate counsel was ineffective for not making a written motion with affidavit prior to the evidentiary hearing.  There is nothing in the court rules that requires appellate counsel to make a motion for disqualification in writing or concerning any sort of affidavit.  Although MCR 2.003 states that a motion for disqualification must be made within 14 days of the discovery of the grounds of disqualification, or if discovered is made within 14 days of the date of the trial or hearing to be made forthwith, the hearing was held within 14 days of the writ of habeas corpus granting the Ginther hearing, and therefore, appellate counsel was procedurally correct.
>
> Therefore, this Court finds that appellate counsel's performance did not fall below an objective standard of reasonableness and the result of the proceeding would not have been different had appellate counsel acted in the manner described by Defendant.

(Dec. 23, 2014 Op., ECF No. 41-3, PageID.403-404.)

The trial court noted that counsel made a procedurally appropriate oral motion

to disqualify the trial judge at the beginning of the *Ginther* hearing;[11] but, the motion

was denied.  It was apparent that counsel was reluctant to pursue the motion.  (*Ginther*

---

[11]In *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), the Michigan Supreme Court approved the process of remanding to the trial court for an evidentiary hearing when an appellant has raised claims of ineffective assistance of counsel that require development of a record.

- 36 -

Hr'g Tr., ECF No. 22, p. 3-5.)  Nonetheless, counsel's failure to obtain the relief was not a product of some shortcoming in the presentation.  As discussed fully above, *see* § IIIA above, the trial judge's expressions of dissatisfaction with Petitioner at the sentencing hearing simply do not reveal the sort of bias that warrants disqualification.  It would not have been ineffective assistance if appellate counsel would have failed to raise the disqualification argument, because it lacked merit.[12]  Certainly, it is not ineffective assistance if counsel failed to prevail on the meritless argument.

Petitioner has failed to demonstrate that the trial court's determination with respect to appellate counsel's effectiveness was contrary to, or an unreasonable application of, *Strickland*, the clearly established federal law on this issue.  Moreover, Petitioner has failed to show that the trial court's factual determinations were unreasonable.  Therefore, Petitioner is not entitled to habeas relief on this issue.

B.    Appellate counsel's failure to raise trial counsel's ineffectiveness

Petitioner's claim that appellate counsel failed to raise trial counsel's ineffectiveness presents a bit of a moving target.  Appellate counsel raised trial counsel's ineffectiveness on Petitioner's direct appeal.  Indeed, appellate counsel succeeded in obtaining a remand to conduct a *Ginther* hearing.  With that record in hand, appellate counsel argued to the Michigan Court of Appeals that trial counsel was ineffective in several respects, including some respects that Petitioner inexplicably now

---

[12]Counsel's failure to raise a meritless issue does not constitute ineffective assistance of counsel.  *See, e.g., Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).  "Omitting meritless arguments is neither professionally unreasonable nor prejudicial."  *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

contends appellate counsel did not raise.  By way of example, appellate counsel raised the issue that trial counsel was unprepared for trial, failed to communicate with Petitioner before the second trial, failed to call Angel Porter and Petitioner's mother, and waived the testimony of Detective Kranich.  Appellate counsel also raised the issue that trial counsel was ineffective with respect to communicating the content of the last plea offer or discussing it with Petitioner until the first day of the second trial so that Petitioner could make an informed decision.  As to these issues, therefore, Petitioner's challenge to appellate counsel's effectiveness fails at the first step.  Petitioner's claim that his appellate counsel failed to raise these issues is factually unsupportable.  Those issues comprise virtually the entirety of Petitioner's ineffective assistance of appellate counsel claim.

If any habeas petition issues regarding appellate counsel's ineffectiveness fell outside of the list of issues raised by appellate counsel in Petitioner's various Michigan Court of Appeals direct appeal briefs, Petitioner raised them himself in his Standard 4 Supplemental Brief.  *See* (Def.'s-Appellant's Supp. Br., ECF No. 23.)  By way of example, Petitioner complained that his trial counsel failed to communicate with Petitioner before the second trial to permit Petitioner to develop a defense against the prosecution witnesses, Dennis Martin, Michael Davis, and Ta-Lisa Flantoill; trial counsel failed to contact Petitioner's mother, Casanova Richardson, or Ricardo Payton; trial counsel failed to investigate Ta-Lisa Flantoill and Jamila Davis; and trial counsel failed to communicate with Petitioner effectively regarding plea offers and the advisability of accepting such offers.  (*Id.*, p. 33-49.)

- 38 -

The Michigan Court of Appeals determined that, with respect to each of these issues, Petitioner failed to demonstrate "that counsel's performance fell below an objective standard of reasonableness." *Wilford*, 2012 WL 5233612 at *3. Because these issues had no merit, it was not objectively unreasonable for appellate counsel to exclude them from his appellate briefs.[13]  Moreover, because the issues were actually raised in the Michigan Court of Appeals, Petitioner cannot demonstrate prejudice–that the result would have been different had appellate counsel raised the issues.   Accordingly, Petitioner has failed to show that the trial court's rejection of Petitioner's ineffective assistance of appellate counsel claims is contrary to, or an unreasonable application of, *Strickland*.   Petitioner is not entitled to habeas relief on this issue.

## C.    Ineffective assistance of trial counsel

Petitioner was represented by retained counsel, Kenneth Marks, during his first and second trials on these charges.  Mr. Marks was not Petitioner's first counsel; two previous appointed counsel were permitted to withdraw. (*Ginther* Hr'g Tr., ECF No. 22, p. 54.) It was also not Mr. Marks' first time representing Petitioner.  He had previously twice secured "not guilty" verdicts in trials where Petitioner had been charged with armed robbery and/or home invasion.  (*Id.*, p. 19.)  Moreover, this was not Petitioner's first conviction.  At the time he robbed Dennis Martin, Petitioner was on parole for two other home invasion charges (he had pleaded guilty in both of those cases).[14]  Finally,

---

[13]*See* footnote 12, *infra*.

[14]*See* http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=264510.

- 39 -

in between the trials in this case, Petitioner was charged with another home invasion in Eaton County. The offense had occurred before the instant offense. He pleaded guilty to a charge of breaking and entering a building with intent to commit a felony.

The alleged instances of ineffective assistance by Mr. Marks are detailed above. Mr. Marks testified that he tried on more than one occasion to visit and communicate with Petitioner between the two trials. His attempts were frustrated, however, by the Eaton County criminal proceedings. Petitioner was not in the Ingham County jail, as expected, when Mr. Marks first attempted to visit. (*Id*., p. 11.) Petitioner was also not returned to the Ingham County jail as scheduled; so Mr. Marks second attempt was frustrated as well. (*Id*.) With regard to Petitioner's claimed exculpatory witnesses, Mr. Marks stated that he believed Angel Porter's testimony would only be helpful if Ricardo Payton testified; and he did not. (*Id*., p. 13-14.) Mr. Marks stated that neither Petitioner nor his mother ever suggested to him that Petitioner's mother could offer exculpatory testimony. (*Id*., p. 15-17.) Mr. Marks also noted that neither Petitioner nor his mother had ever indicated that Casanova Richardson could offer exculpatory testimony. (*Id*., p. 18.) Mr. Marks also reported that he had communicated all plea offers to Petitioner (*Id*., p. 8-10), that he had informed Petitioner that the retrial would likely result in a conviction (*Id*., p. 9), and that the prosecutor would likely produce Ta-Lisa Flantoill at the second trial (Affidavit of Kenneth Marks, ECF No. 23). Finally, Mr. Marks testified that Petitioner rejected all plea offers, not so much because the offered sentences were so objectionable, but because the "tail," the remaining term on

the sentences for which he was on parole, was so significant that any plea would yield an unacceptable sentence.  (*Ginther* Hr'g Tr., ECF No. 22, p. 51.)

Petitioner intimated that he really had no clue where things stood on his case or what his sentencing exposure might be.  He claims, because Mr. Marks stayed out of contact, there was never a coherent defense.  He claims he informed Mr. Marks regarding the testimony from his mother and other possible witnesses.  Petitioner contends Mr. Marks simply failed to investigate the testimony that Ta-Lisa Flantoill would offer so that Petitioner was blindsided at the second trial.

Petitioner's position on the testimony of Ta-Lisa Flantoill is a little hard to pin down.  He named her as a person who could corroborate his version of events regarding how he made his way to 834 Johnson Street.  At the first trial he testified that "Teasa" dropped him off.  At the second trial Petitioner provided much greater detail.  He said it was Ta-Lisa Flantoill, also known as "Teasa," driving her Dodge Neon.

Once Petitioner was faced with Teasa's non-corroborating testimony, his story changed.  It was not Teasa that dropped him off.  It was "Tessa," who Petitioner now claims was actually Jamila Davis, a friend of Petitioner's housemate Casanova Richardson.  Richardson, Davis and Petitioner traveled to the Secretary of State's office that morning in Davis' Dodge Neon.  It was on the way back from the Secretary of State's office that Davis dropped Petitioner at 834 Johnson Street.

Although that clears up one glaring discrepancy between Petitioner's testimony and Teasa's, it leaves several others undisturbed and raises a pressing question.  If Petitioner rode with Richardson and Davis to 834 Johnson Street, why did he say he

rode with Teasa?  Petitioner explains this away by claiming he did not know the women that well.  (*Ginther* Hr'g Tr., ECF No. 22, p. 45.)  That representation is belied somewhat by Teasa's undisputed testimony that she spent time at Petitioner's place "almost every day" from when they met until Petitioner's arrest.  (Trial II, Tr. II, ECF No. 20, p. 31-32.)  Indeed, Teasa testified that she and Petitioner spent the night before the robbery together.  (*Id.*, p. 30.)  Ultimately, it appears Petitioner either has a very bad memory or he is a facile liar.

That was the conclusion reached by the trial court.  The trial judge determined that Mr. Marks was credible and Petitioner and his mother were not.  (*Ginther* Hr'g Tr., ECF No. 22, p. 56.)  That factual finding is amply supported in the record.

Once the state court rejected the incredible testimony of Petitioner and accepted the credible testimony of Mr. Marks, the *Strickland* analysis was straightforward.  Mr. Marks adequately informed Petitioner regarding the strength of his position in the second trial.  Mr. Marks adequately communicated the plea offers to Petitioner.  Mr. Marks warned Petitioner that the prosecutor would find Teasa.  Petitioner's ineffective assistance claim, therefore, fails at the first step.

Petitioner, no stranger to criminal proceedings, was aware of the risks when he rejected the ten-year minimum plea offer.  He decided to take a chance that Teasa would back him up.  She did not.  He took a chance that he could avoid a fourth offender enhanced sentence and a big tail on his prior offenses.  He lost.

Petitioner has failed to demonstrate that the trial court's or the court of appeals'
rejection of his ineffective assistance of trial counsel claim was contrary to, or is an
unreasonable application of, *Strickland*.  Accordingly, he is not entitled to habeas relief.

## **Certificate of Appealability**

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that a certificate of appealability should be denied.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.


Dated:   July 5, 2017              /s/  Phillip J. Green
                                   PHILLIP J. GREEN
                                   United States Magistrate Judge


## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).